UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **FURNELL SEVERIN JR.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 07-1541** |
| **BURL CAIN, WARDEN** | **SECTION "B"(4)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **Title 28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**. Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2).[1]

**I.    Factual and Background**

The petitioner, Furnell Severin, Jr., ("Severin"), is a convicted inmate presently incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2] On May 23, 2002, Severin was indicted by a Grand Jury in Jefferson Parish for the second degree murder of Stanley Norman (Count One),

---

[1]Under Title 28 U.S.C. § 2254(e)(2), an Evidentiary Hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 3.

and the attempted second degree murder of Terrence Jones (Count Two), and the attempted second degree murder of Chaz Adams (Count 3).[3]

The record reflects that, in the early morning hours of March 30, 2002, Furnell Severin, Charley Hollins, and Chad Gooden arrived at Mike's Place, a bar at 433 Veterans Boulevard in Kenner, in Gooden's black 1994 Chevrolet Impala.[4] These men were joined by Shawn Moore and Brandon Irving, who arrived at the bar shortly after midnight in Irving's white Chevrolet Impala. Both cars were parked at the far side of the parking lot, some distance from the bar's front entrance.

Ashley Washington also arrived at Mike's Place between 12:30 and 12:45 a.m. She did not go inside, because she was only sixteen years old. Instead, she waited outside for an older friend who had gone into the bar. Thirty to forty-five minutes after she arrived, she saw Severin leave the bar saying to himself that he was going to get "that thing," because someone in the bar had "pissed him off."

Washington saw Severin walk around the side of the building, and return to the front of the building where he shot a handgun at Norman and his companions, who were walking away in the parking lot. Washington also saw another skinny, dark-skinned man who was with Severin aim a handgun at the ground and fire. Washington and her friends ran to their car to leave. They saw Norman slumped over the steering wheel of his car and he was bleeding profusely from the chest.

Terrence Jones also was at Mike's Place with a group of friends, including Norman. At one point, Jones saw his friends engage in an altercation with a group of other young men in the bar.

---

[3]St. Rec. Vol. 1 of 7, Indictment, 5/23/02; Grand Jury Return, 5/23/02.

[4]The facts of the case were taken from the opinion of the Louisiana Fifth Circuit Court of Appeals on direct appeal. *State v. Severin*, 885 So. 2d 609, 610 (La. Ct. App. 2004); St. Rec. Vol. 3 of 7, 5th Cir. Opinion, 04-KA-326, pp. 2-9, 9/28/04.

That group included Chad Gooden and Severin, whom Jones knew from middle school. Jones did not know how the fight started because the loud music in the bar made it impossible for him to hear what the parties were saying. The fight escalated, and one of Jones's friends, Michael Bernard, was hit in the face with a bottle.

Jones helped Bernard out of the bar, and they walked toward Norman's car to leave. Severin ran toward him, firing seven or eight times towards them from a distance of about thirty feet. Jones was hit, and fell to the ground. When the shooting stopped, Jones made his way to Norman's car, where he found Norman slumped over the steering wheel, bleeding from a gunshot wound.

Sergeant Richard Mottley and Sergeant Emile Sanchez of the Kenner Police Department were having breakfast at Rick's Café on Loyola Drive, one-half block away from Mike's Place, when a man entered and told them shots had been fired at the bar. The two officers immediately got into their police units and drove to the scene. Sergeant Sanchez alerted Troy Simon, a police radio dispatcher, to the shooting report. Mike's Place was across the street from police headquarters. The dispatcher went to a window and he saw a man in front of Mike's Place raise his hand and fire a gun into a group of about five people. The people fled from the shooter, and two of them fell to the ground.

Three other officers, Patrick Gallagher, Mary McCormick, and Chad Peterson, who were at the police headquarters, exited through the rear of the building and proceeded to the scene on foot. The officers shouted at the shooter, later identified as Severin, "Stop, police department, stop." Severin looked at the officers as they approached, and fired an additional shot. He then got into a car and drove it directly toward the officers.

Officers Peterson and Gallagher opened fire on Severin's car. Severin turned his vehicle and drove it across the median on Veterans Boulevard, heading eastbound in the westbound lanes. Sergeant Mottley arrived at the scene in a police vehicle and pursued Severin's car. Severin traveled east on Veterans Boulevard, crossing into the eastbound lanes. He turned right onto Williams Boulevard, and Sergeant Mottley followed. Sergeant Mottley pulled Severin over in the 1800 block of Williams. Sergeant Mottley stopped his car behind Severin's vehicle, and used a microphone to instruct Severin to get out of his car. Severin then drove off at a high rate of speed. Sergeant Mottley continued to follow.

Severin's accelerated speed caused the car to go airborne over a pair of railroad tracks and the car came to a stop on the levee. When Sergeant Mottley approached the car, Severin was still in the driver's seat. There also was a man in the front passenger seat, and another in the back seat. After Severin was advised of his rights, he told Officer Peterson that there was a fight inside of Mike's Place after someone spilled a drink on him, and so he "capped him."

Severin later gave a tape recorded interview during which he stated that he went to Mike's Place with Chad, Charley, Shawn, and Brandon. Severin stated that he was intoxicated because he drank a fifth of Hennessey before arriving at the bar, and he had more to drink after he got there. He said that someone in the club hit him and knocked him to the floor. He recalled that people wearing red and blue rags kicked him and Charley.

Severin claimed that he and Charley left the bar and went to Chad's car. Shots were fired from a group of black men outside the bar, and Charley was wounded. Severin grabbed his pistol from under the driver's seat. He fired shots in the direction from which he believed the shots had been fired at Charley, and he did not hit anyone. He got into the car and drove away while someone

4

was shooting at him. He eventually threw the gun out of the car and continued to drive until he hit something. Severin told the officers that he did not intend to kill anyone and that he fired his gun in response to the gunfire that was directed at him.

Severin was tried before a jury on Count One, the second degree murder of Stanley Norman, and Count Two, the attempted second degree murder of Terrence Jones, on September 24 through 26, 2003, and he was found guilty as charged.[5] On November 21, 2003, the Trial Court sentenced Severin to serve life imprisonment without benefit of parole, probation, or suspension of sentence for second degree murder.[6] The court later sentenced him on January 8, 2004, to serve 50 years without benefit of parole, probation, or suspension of sentence, for attempted second degree murder.[7] The State entered a nolle prosequi as to the third count, the attempted second degree murder of Chaz Adams.[8]

On appeal, Severin's counsel argued that the evidence was insufficient to support the verdict because the State failed to prove specific intent or that Severin fired the fatal shots.[9] On September 28, 2004, the Louisiana Fifth Circuit Court of Appeal affirmed the conviction finding no merit to the claim.[10]

---

[5] St. Rec. Vol. 3 of 7, Trial Minutes, 9/24/03; Trial Minutes, 9/25/03; Trial Minutes, 9/26/03; St. Rec. Vol. 4 of 7, Jury Verdict - Count 1, 9/26/03; Jury Verdict - Count 2, 9/26/03; St. Rec. Vol. 5 of 7, Trial Transcript, 9/24/03; Trial Transcript, 9/25/03; St. Rec. Vol. 6 of 7, Trial Transcript (continued), 9/25/03; Trial Transcript, 9/26/03.

[6] St. Rec. Vol. 4 of 7, Sentencing Minutes, 11/21/03; St. Rec. Vol. 6 of 7, Sentencing Transcript, 11/21/03.

[7] St. Rec. Vol. 4 of 7, Sentencing Minutes, 1/8/04; St. Rec. Vol. 6 of 7, Sentencing Transcript, 1/8/04.

[8] St. Rec. Vol. 2 of 7, Indictment, handwritten notation dated 11/21/03; St. Rec. Vol. 4 of 7, Sentencing Minutes, 11/21/03.

[9] St. Rec. Vol. 6 of 7, Appeal Brief, 04-KA-0326, 4/19/04.

[10] *Severin*, 885 So. 2d at 609; St. Rec. Vol. 3 of 7, 5th Cir. Opinion, 04-KA-326, 9/28/04.

On October 19, 2004, Severin submitted pro se a timely[11] writ application, which was filed by the Louisiana Supreme Court on November 15, 2004, seeking review of the sufficiency of the evidence claim.[12] The Louisiana Supreme Court denied the writ application without reasons on March 11, 2005.[13]

Severin's conviction became final 90 days later, on June 9, 2005, because he did not file a writ application with the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under Title 28 U.S.C. § 2244(d)(1)(A)); U.S. S.Ct. Rule 13(1).

## II. Procedural Background

On March 9, 2006, Severin's retained counsel filed a Petition for Post Conviction Relief alleging that the evidence was insufficient to support the verdict because the State failed to prove specific intent.[14] The Trial Court denied relief finding that the petition was repetitive of the claim raised on direct appeal.[15]

---

[11]La. S.Ct. R. X§5(a) provides that an application seeking review of the judgment of the court of appeal shall be filed or postmarked within 30 days of the issuance of the appellate court's judgment. *See also* LA. CODE CRIM. PROC. ANN. art. 922 (2008).

[12]St. Rec. Vol. 7 of 7, La. S. Ct. Writ Application, 04-KO-2805, 11/15/04 (signed 11/19/04, attached envelope postmarked 10/21/04); St. Rec. Vol. 3 of 7, La. S. Ct. Letter, 2004-KO-2085, 11/15/04 (indicating incorrect postmark of 11/12/04).

[13]*State v. Severin*, 896 So. 2d 64 (La. 2005); St. Rec. Vol. 7 of 7, La. S. Ct. Order, 2004-KO-2805, 3/11/05.

[14]St. Rec. Vol. 4 of 7, Petition for Post Conviction Relief, 3/9/06.

[15]St. Rec. Vol. 4 of 7, Trial Court Order, signed 3/20/06, filed 3/22/06. With regard to post-conviction claims, La. Code Crim. P. art. 930.4(A) provides that "[u]nless required in the interest of justice, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered."

Severin, acting *pro se*, sought review of this order with the Louisiana Fifth Circuit.[16] The Court denied the application on May 1, 2006, finding no error in the Trial Court's ruling.[17]

On May 24, 2006, Severin's counsel filed a writ application with the Louisiana Supreme Court raising three grounds for relief:[18] (1) insufficient evidence; (2) the Trial Court failed to instruct the jury on adverse inferences to be drawn from uncalled witnesses; and (3) the ends of justice warranted a new trial. In the meantime, on May 18, 2006, Severin submitted *pro se* a writ application to the Louisiana Supreme Court, which was filed on June 14, 2006, arguing that the Louisiana Fifth Circuit erred in failing to consider the sufficiency of the evidence claim in the interest of justice rather than approving the procedural bar.[19] In separate orders issued March 9, 2007, the Louisiana Supreme Court denied both applications without reasons.[20]

## III. Federal Petition

On May 2, 2007, the Clerk of Court filed Severin's petition for federal habeas corpus relief, in which he alleges that the evidence was insufficient to support the verdict.[21] The State filed a

---

[16]St. Rec. Vol. 7 of 7, Copy of 5th Cir. Writ Application. The filing date of the application, 4/27/2006, appears on the face of the Court's subsequent order and it was timely filed. *See* St. Rec. Vol. 4 of 7, Notice of Intent, 4/17/06; Trial Court Order, 4/26/06 (return date set for 5/24/06).

[17]St. Rec. Vol. 7 of 7, 5th Cir. Order, 06-KH-305, 5/1/06.

[18]St. Rec. Vol. 7 of 7, La. S. Ct. Writ Application, 06-KP-1226, 5/24/06; St. Rec. Vol. 3 of 7, La. S. Ct. Letter, 2006-KP-1226, 5/24/06.

[19]St. Rec. Vol. 7 of 7, La. S. Ct. Writ Application, 06-KH-1520, 6/14/06 (signed 5/18/06, postmarked 5/22/06); St. Rec. Vol. 3 of 7, La. S. Ct. Letter, 2006-KH-1520, 6/14/06.

[20]*State v. Severin*, 949 So. 2d 432 (La. 2007); St. Rec. Vol. 7 of 7, La. S. Ct. Order, 2006-KP-1226, 3/9/07; *State ex rel. Severin v. State*, 949 So. 3d 437 (La. 2007); St. Rec. Vol. 7 of 7, La. S. Ct. Order, 2006-KH-1520, 3/9/07.

[21]Rec. Doc. No. 3.

response in opposition to Severin's petition arguing that his claim is without merit.[22] Severin later filed a traverse to the State's opposition reiterating his argument that he is entitled to relief because the evidence failed to establish a specific intent.[23]

## IV.  General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[24] applies to this petition, which is deemed filed in this court under the federal mailbox rule on March 28, 2007.[25] The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), ©).

---

[22]Rec. Doc. No. 13.

[23]Rec. Doc. No. 14.

[24]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and applied to habeas petitions filed after its effective date, April 24, 1996. *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)). The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[25]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting *pro se*. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed Severin's federal habeas petition on May 2, 2007, when the filing fee was paid after denial of his request for pauper status. Severin dated his signature on the petition and memorandum in support on March 28, 2007. This is the earliest date on which he could have delivered it to prison officials for mailing. The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his *pro se* petition. *See Cousin v. Lensing*, 310 F.3d 843, 843 (5th Cir. 2002) (mailbox rule applies even if inmate has not paid the filing fee at the time of mailing) (citing *Spotville*, 149 F.3d at 374).

The record reflects that Severin's petition was timely filed, his claim is exhausted, and the claim is not in procedural default.[26] The Court will review the merits of his claim.

## V.     **Standards of Review on the Merits**

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000). It provides different standards for questions of fact, questions of law and mixed questions of fact and law.

A state court's determinations of questions of fact are presumed correct and the court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA. The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.

---

[26]The Louisiana courts did not consider the insufficient evidence claim on post-conviction review because of the procedural bar under La. Code Crim. P. art. 930.4(A), which prevents <u>further</u> review of a claim previously raised on appeal. This bar is based on the assumption that an issue was addressed in a prior proceeding and is now repetitive. The presumption in the rule is that the claims were not new or different from something previously addressed and resolved on appeal. *Bennett v. Whitley*, 41 F.3d 1581, 1583 (5th Cir. 1994). However, "the bar imposed by article 930.4(A) is not a procedural bar in the traditional sense, nor is it a decision on the merits." *Id*. For this reason, the bar imposed on post-conviction review does not affect this Court's ability to consider on habeas review the state court's underlying review of a claim considered on direct appeal. This Court looks instead to the underlying basis for the original denial of relief. In this case, on direct appeal, the claim was found to be without merit.

A state court's decision may be "contrary to" federal law if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*, 210 F.3d at 485. A state court's decision may involve an "unreasonable application" of federal law if it either (1) correctly identifies the governing rule but then applies it unreasonably to the facts, or (2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law. *cf. Wright v. West*, 505 U.S. 277, 304 (1992). The court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law. *See, e.g., Id.* at 305; *see also Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir. 2000), *cert. denied*, 531 U.S. 1002 (2000). "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'" (brackets in original) *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002). The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. *Price*, 538 U.S. at 641

(quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006).

## VI. Sufficiency of the Evidence

Severin alleges that there was insufficient evidence to support a conviction for second degree murder. He claims that the evidence did not establish a specific intent to kill Norman or to injure Jones, and that the evidence, at best, supported a verdict of manslaughter. The State alleges that the state courts' decision to uphold the conviction was not contrary to, and did not involve an unreasonable application of, federal law.

Severin's counsel first raised this claim on direct appeal to the Louisiana Fifth Circuit, arguing that the evidence was insufficient to establish an intent to kill or that Severin was the person who shot the victims. The Court denied relief and resolved that the evidence, including circumstantial evidence, was sufficient under the standards in *Jackson v. Virginia*, 433 U.S. 307 (1979), and related state case law.

In its reasoned decision, the Louisiana Fifth Circuit resolved that the evidence was sufficient to establish that Severin fired the shots that killed Norman and injured Jones. This, along with the physical evidence, established the requisite intent to support the convictions. The Court also concluded that it was solely within the province of the jury to find the witnesses' testimony to be more credible than that of Severin. This was the last reasoned decision on the issue since the Louisiana Supreme Court denied the subsequent writ application without reasons. *See Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate its reasons for denying relief on a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

The appropriate standard for determining the sufficiency of evidence is that set forth in *Jackson v. Virginia*, which was relied upon by the state appellate court. The *Jackson* standard requires the Court to determine whether, after viewing the entire record and the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Gilley v. Collins*, 968 F.2d 465, 467 (5th Cir. 1992); *Guzman v. Lensing*, 934 F.2d 80, 82 (5th Cir. 1991).

Claims of insufficient evidence present a mixed question of law and fact. *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995). The Court must therefore give deference to the state court's findings unless the decision was contrary to, or involved an unreasonable application of, *Jackson*. *Gilley*, 968 F.2d at 467 (citing *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990)).

In Louisiana, the offense of second degree murder, relevant to this case, is defined by Louisiana law as "the killing of a human being: When the offender has a specific intent to kill or to inflict great bodily harm." LA. REV. STAT. ANN. § 14:30.1 (2009). To establish the element of attempt in the second count, the State must prove that a defendant had a specific intent to kill or inflict great bodily harm and did an act for the purpose of and tending directly toward the accomplishment of the murder. LA. REV. STAT. ANN. § 14:27(A) (2008); *State v. Langston*, 3 So. 3d 707 (La. Ct. App. 2009). Motive is not a required element of second degree murder and need not be proven by the State. *State v. Nguyen*, 888 So. 2d 900, 907 (La. Ct. App. 2004). However, proof of motive may assist in establishing the element of specific intent. *See State v. Williams*, 633 So. 2d 147, 149 (La. 1994).

The phrase "specific intent" is defined in Louisiana as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act."

LA. REV. STAT. ANN. § 14:10(1) (2008). Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions. *State v. Henderson*, 762 So. 2d 747, 751 (La. Ct. App. 2000). For example, specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person, even if that person was not the intended victim. *Henderson*, 762 So. 2d at 750-51.

In this case, the jury heard the testimony of several witnesses, which, in a light most favorable to the prosecution, established that Severin had the requisite intent to kill or cause great bodily harm and that he was the shooter. Ashley Washington heard Severin say that Norman and his friends had upset him inside the bar.[27] She watched Severin return with a gun and open fire on Norman and his friends. Washington also saw Norman fall to the ground after Severin shot the gun and Severin was the only person she saw shoot at Norman.[28]

Jones, the other victim, testified that there was a fight in the bar between his friends and some other people.[29] He went outside where the fight continued and he went to help a friend who was hit in the face with a bottle.[30] As they walked to the car, thinking the fight was over, he saw Severin running toward him while shooting a gun.[31] As he started to run, he was shot and then laid on the ground.[32] After the firing stopped, someone helped him up and he ran to Norman's car to try

---

[27] St. Rec. Vol. 5 of 7, Trial Transcript, p.9, 9/24/03.

[28] *Id.*, pp. 9-10, 12.

[29] St. Rec. Vol. 5 of 7, Trial Transcript, pp. 8-9, 9/25/03.

[30] *Id.*, p. 9.

[31] *Id.*

[32] *Id.*

13

to get to the hospital.[33] There, he saw that Norman also had been shot and he was laying across the steering wheel.[34]

Officer Simon, the dispatcher, saw a man, later identified as Severin, fire into a crowd of about five people.[35] He saw two men fall to the ground after being shot by Severin.[36] Simon was able to watch Severin and inform the officers who were arriving on the scene.[37] He saw Severin get into his vehicle and drive away toward the approaching officers.[38]

The jury also heard the testimony of the officer, Sergeant Mottley, who pursued Severin, and his two passengers, in a high speed chase after the shooting.[39] The jury also received testimony from the other officers, Gallagher, McCormick, and Peterson, who saw Severin shoot into the crowd before driving off.[40] These officers located the three victims immediately after witnessing the shooting.[41]

---

[33]*Id.*, pp. 9-10.

[34]*Id.*, p. 10.

[35]*Id.*, p. 38.

[36]*Id.*

[37]*Id.*, p. 39.

[38]*Id.*, pp. 39-40.

[39]*Id.*, pp. 53-68.

[40]*Id.*, p. 72 (Officer Gallagher), p. 95 (Officer McCormick); St. Rec. Vol. 6 of 7, Trial Transcript (continued), p. 105 (Officer Peterson), 9/25/03.

[41]*Id.*, p. 73 (Officer Gallagher); St. Rec. Vol. 6 of 7, Trial Transcript (continued), p. 97 (Officer McCormick), p. 106 (Officer Peterson), 9/25/03.

Officer Peterson also participated in Severin's arrest and administered the *Miranda* warnings to him.[42] Severin then told the officer that there had been a fight in the bar involving a spilled drink and that he "capped him," meaning that he shot him.[43]

Severin admitted that he discharged his weapon into the crowd. He told officers in his recorded statement, which was played for the jury, that a fight broke out in the bar after someone hit him.[44] He indicated that he was intoxicated and was dancing with a girl the other group knew. He stated that, after the fight, he left the bar and went to his car, where he heard a gunshot coming from a group of people standing close together in the parking lot.[45] Severin testified at trial that he reacted to the shots by grabbing his gun, which he knew was loaded.[46] He fired back randomly into the group of people where he thought the first shot came from.[47] He then drove off in his car with two of his friends.[48] He denied, however, that anyone was hit by the bullets he fired.[49] He testified that it must have been someone else who shot the victims.[50]

The foregoing testimony was before the jury and was sufficient for the jury to find that Severin knowingly fired his loaded gun into a group of people in the parking lot after becoming

---

[42] St. Rec. Vol. 6 of 7, Trial Transcript (continued), p. 107, 9/25/03.

[43] *Id.*, p. 108.

[44] *Id.*, pp. 135-38.

[45] *Id.*, pp. 143-45.

[46] St. Rec. Vol. 7 of 7, Trial Transcript, p. 18, 9/26/03.

[47] St. Rec. Vol. 6 of 7, Trial Transcript (continued), pp. 150, 154, 9/25/03; St. Rec. Vol. 7 of 7, Trial Transcript, pp. 23-26, 9/26/03.

[48] *Id.*, p. 156.

[49] St. Rec. Vol. 7 of 7, Trial Transcript, pp. 28-29, 9/26/03.

[50] *Id.*

angered by the altercation, the injuries from the fight, and, considering Severin's testimony, his belief that someone shot at him. This is sufficient to demonstrate the specific intent, and a motive, for second degree murder and the attempt thereof. *See Henderson*, 762 So. 2d at 750-51.

Severin also suggests, under a broad reading, that the jury should not have believed the State's witnesses and instead should have believed his testimony that he intended no harm and did not strike anyone with the bullets he shot. However, the determination of the credibility of a witness is within the province of the jury. *Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981) (that the jury chose to believe a witness whose credibility was challenged is not a question of constitutional dimensions). The habeas court should defer to the jury's resolution of credibility determinations and justifiable inferences of fact. *Holderfield v. Jones*, 903 F. Supp. 1011, 1018 (E.D. La. 1995) (citing *U.S. v. Hatch*, 926 F.2d 387, 399 (5th Cir. 1991)). In this case, the jury chose to believe the State's witnesses. As noted above, the jury heard testimony from several sources, as summarized above, that Severin was the only person to shoot <u>into</u> the group of people where Norman and Jones were shot. The Court notes that Severin himself indicated that the shot he heard, which prompted his "random" fire, came out of or <u>from</u> someone in the crowd in the parking lot. The resolution of any conflict regarding additional gunfire was within the jury's province.

Based on the foregoing review, the record is replete with testimony and evidence that supports the verdict of the jury. Considered in the light most favorable to the prosecution, the record contains more than enough direct and circumstantial evidence to demonstrate that Severin had specific intent to kill or to commit great bodily harm when he shot his gun at Norman, Jones, and the other patrons.

The state courts' denial of relief on this claim was not contrary to or an unreasonable application of federal law. Severin is not entitled to relief on this claim.

## VII. Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Furnell Severin, Jr.'s petition for issuance of a Writ of Habeas Corpus filed pursuant to Title 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within ten (10) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this 25th day of August, 2009.

**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**